[Civ. No. 38577. First Dist., Div. One. Nov. 16, 1976.]

ALLEN F. BREED, as Director, etc., Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
JOHN G., Real Party in Interest.

**COUNSEL**

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and William D. Stein, Deputy Attorneys General, for Petitioner.

D. Lowell Jensen, District Attorney, T. W. Condit, Robert Chambers and David K. Hicks, Deputy District Attorneys, for Respondent.

No appearance for Real Party in Interest.

**OPINION**

**SIMS, J.**—The Director of the Department of the Youth Authority has sought a writ of prohibition to restrain the respondent superior court, hereinafter referred to as the juvenile court, from enforcing an order which continued real party in interest, then 18, now 19, under an earlier commitment to the Youth Authority and released him from custody pending a further hearing. The director also seeks a writ of mandate compelling the juvenile court to set aside that order.

The subject of the order, who was born August 20, 1957, was last committed to the Youth Authority on July 29, 1975, when he was 17 years of age.[1] His commitment followed a finding that he violated Penal Code section 417, two counts, and section 148, as a result of an incident on July 6, 1975, when he was arrested and charged with brandishing a knife at two women, resisting arrest, assault and disturbing the peace.

[1]At the time the ward was last committed to the Youth Authority the court had before it a juvenile record dating back to February 9, 1965, when, as a seven-year-old boy, he was reprimanded for an attempted sexual assault on a young girl. On December 7, 1966, he was made a ward of the court when he was found guilty of two residential burglaries, and it appeared that reprimand and informal probation for prior shoplifting offenses had not secured his rehabilitation. The record reflects robbery, incorrigibility, at home, battery, and loitering, preceding a charge of petty theft which resulted in his commitment to a boys' camp on October 4, 1972. Four months later he was returned to court as a camp failure, and was first committed to the Youth Authority on February 23, 1972. On April 13, 1973, he was found guilty of robbery and assault committed in Oakland after he escaped while on a field trip to that city at that time. He was recommitted to the Youth Authority and was paroled on June 11, 1975, less than a month before he committed the offenses leading to his last commitment.

The juvenile court may retain jurisdiction over any ward until he attains the age of 21 years. (Welf. & Inst. Code, §§ 607 and 1769. See also Stats. 1976, ch. 1068, § 22 and ch. 1071, §§ 13 and 34. Cf. *In re Bryan* (1976) 16 Cal.3d 782, 788 [129 Cal.Rptr. 293, 548 P.2d 693].)

The director by letter dated October 20, 1975,[2] ordered the youth returned to court pursuant to the provisions of section 1737.1 of the Welfare and Institutions Code.[3] On October 23, 1975, he was received by probation authorities in the committing jurisdiction and transferred to the county hospital for a psychiatric evaluation to determine whether he was subject to commitment as a result of a mental disorder. (See Welf. & Inst. Code, §§ 5150 and 6551. Note *In re Michael E.* (1975) 15 Cal.3d 183, 189-191 [123 Cal.Rptr. 103, 538 P.2d 231].) The examining physician assessed the youth as follows: ". . . This man may have psychotic episodes but there is no evidence of same at present." He was returned to

---

[2]The letter reads: "You will recall receiving a telephone call and letter from Mr. Robert Mayse of my staff concerning this minor. The Youth Authority Board, on September 22, 1975, referred the case to me for possible return to court. It was the Board's feeling that all Youth Authority resources have been exhausted in the treatment of John's problems. [¶] Subsequently, Mr. Eric Walden of your probation department staff has been in touch with us. Our original intent was to work closely with the court toward effecting a treatment program which might better meet some of this young man's needs. Specifically, we were concerned about his apparent need for a state hospital program and the constraints placed upon the court by the recent *Michael E.* decision. Mr. Walden advises that the evaluation for possible conservatorship can be performed at the Highlands Hospital. If that evaluation points to the need for conservatorship, the juvenile court could then terminate its jurisdiction to allow appropriate hospitalization. [¶] I am therefore ordering return of the minor to court pursuant to Section 1737.1 of the Welfare and Institutions Code. Youth Authority transportation will deliver him to the Alameda County Juvenile Hall during the week of October 20."

The letter first referred to, dated October 8, 1975, reads in part: "John was recommitted to the Youth Authority from the Alameda County Juvenile Court on July 29, 1975, for threatening with a weapon and resisting arrest. He is presently diagnosed as a chronic schizophrenic by our consulting psychiatrist, Dr. R. G. Kuehnert. It is our feeling that Youth Authority treatment resources have been exhausted in his case. We had placed him at Atascadero State Hospital earlier in his career. It was necessary to return him to the Youth Authority due to his status as a juvenile court commitment. Even though he has now passed his eighteenth birthday, we are prevented by policy and law from seeking his return to Atascadero. The Youth Authority Board, on September 22, 1975, referred John's case to the Director for possible return to court in order to facilitate transfer to Atascadero. The Board stated it felt that he had exhausted resources within the department. . . . [¶] We will be very grateful for any assistance the court can give us with this extremely difficult case."

[3]Section 1737.1 reads in pertinent part: "Whenever any person who has been charged with or convicted of a public offense and committed to the authority appears to the authority, either at the time of his presentation or after having become an inmate of any institution or facility subject to the jurisdiction of the authority, to be an improper person to be retained in any such institution or facility, or to be so incorrigible or so incapable of reformation under the discipline of the authority as to render his detention detrimental to the interests of the authority and the other persons committed thereto, the authority may return him to the committing court. . . . In the case of a person who has been committed to the authority by a juvenile court, the juvenile court to which he is returned may make such further order or commitment with reference to such person as may be authorized by the juvenile court law, except that said court may not recommit such person to the Youth Authority."

court on October 24, 1975, for a detention hearing on a petition which alleged he had been returned to the committing court pursuant to the provisions of section 1737.1. The court dropped the new petition from the calendar and ordered the ward returned to the care and custody of the Youth Authority under the commitment made on July 29, 1975. Because of his age and record the ward was detained in jail. On October 27, the probation officer wrote the Youth Authority concerning the court action. On November 5 the Youth Authority advised that it would not accept the ward if he were returned because he had been diagnosed as falling within the provisions of section 1737.1 (see fn. 3 above).

Under date of November 17, 1975, the Youth Authority furnished the probation officer with the data on which it predicated its evaluation of the ward's need for psychiatric treatment which it could not furnish.[4] Thereafter, further proceedings were taken to secure a psychiatric evaluation of the ward.[5] The matter came before the court on December 16, 1975, for a report on the attempts to refer the ward to the Department of Mental Hygiene under section 5150 of the Welfare and Institutions

[4]The letter of November 17, 1975, indicates that following his 1973 commitment the ward apparently had been transferred to Atascadero State Hospital. (See § 1756, but cf. § 779 last sentence.) In July 1974 those Youth Authority committees under the age of 18 years were ordered removed from Atascadero, presumably because a commitment under the Lanterman-Petris-Short Act was deemed necessary. (See §§ 6550 and 6551; and In re L.L. (1974) 39 Cal.App.3d 205, 214 [114 Cal.Rptr. 11], subsequently approved by In re Michael E. (1975) 15 Cal.3d 183, 187-191 [123 Cal.Rptr. 103, 538 P.2d 231].) The letter indicates that he was appropriately placed at Atascadero and was responding to treatment. It also notes that Youth Authority psychiatrists in March and September 1975 indicated mental illness which would continue to intensify without treatment which the Youth Authority could not give. Although petitioner states that as a result of the decision in In re Michael E., supra, 15 Cal.3d 183, 189, the ward had to be removed from Atascadero State Hospital where he was responding to treatment, the record indicates he was removed July 18, 1974, and paroled June 11, 1975, all before that case was decided on August 4, 1975.

[5]These proceedings were summarized in the probation officer's report of December 12, 1975, as follows:

". . . On November 24, 1975, the minor was seen again at Highland Psychiatric Receiving. All pertinent past psychiatric reports were furnished to Dr. Sherman at Highland. For security reasons, Dr. Sherman sent John to Atascadero State Hospital for 72-hour evaluation. Both Dr. Sherman and staff from Atascadero felt, based on John's records that the minor was psychotic and quite dangerous. However, again, the minor displayed no psychotic or threatening behavior in the presence of diagnostic staff. [¶] Reports from Dr. Sherman and from Atascadero were forwarded to Fairmont Hospital, Criminal Justice Mental Health Office. Dr. Allister's examination resulted in a diagnosis similar to Dr. Sherman's. However, again, John displayed no signs of aggressiveness or psychotic behavior during the exam period. Thus, conclusions of all examinations were that John may be psychotic but not so much so that he qualified for commitment under the Section 5150 of the Welfare and Institutions Code."

Code. The report set forth what had been done, and pointed out the impasse which had arisen between the Youth Authority and the juvenile court. It recommended, and the court ordered, that the matter be continued for two weeks for clarification of that issue. On December 31, 1975, the court made the following order: ". . . Said minor having been returned from the Youth Authority pursuant to Section 1737.1 of the Welfare and Institutions Code, Court orders said minor continued under the present commitment to the Youth Authority, said minor is released from custody and the matter is continued to March 31, 1976 at 9:00 A.M. for report. Said minor need not be present on March 31, 1976."[6]

On March 1, 1976, the director filed the petition which is the subject of these proceedings. An alternative writ of mandate issued June 10, 1976, and the court made return on July 8, and the matter was thereafter argued and submitted. The public defender, who represented real party in interest, has indicated by letter that he is closely allied with the director's position, and that he is content to await the court's decision on the dispute between the court and the director without a further appearance.

We are asked to resolve the impasse occasioned by the decision in *Breed* v. *Jones* (1975) 421 U.S. 519 [44 L.Ed.2d 346, 95 S.Ct. 1779], wherein it was determined that the prosecution of a minor in the superior court after an adjudicating proceeding in the juvenile court violated the double jeopardy clause of the Fifth Amendment as it applies to the states through the Fourteenth Amendment (421 U.S. at p. 541 [44 L.Ed.2d at p. 362]). It thereby nullified the provisions of section 707, which at the time of the ward's return to court in October 1975 purported to permit the court to direct that proceedings be commenced in the criminal court when a ward was returned by the Youth Authority pursuant to section 1737.1.[7] Our Supreme Court has recognized,

---

[6]The return includes a progress report dated March 31, 1976. It notes that a Youth Authority parole agent was seeing the youth almost daily and reported that he was still periodically irrational and seemed to be potentially dangerous. The agent stated he was working with the boy for personal reasons and not as a ward of the Youth Authority. A declaration in the return indicates that the youth had struck his sister violently in a family argument in June, and that another Youth Authority agent was supervising him.

[7]Section 707 (Stats. 1965, ch. 534, § 1, p. 1849, as amended Stats. 1967, ch. 1357, § 1, p. 3197) provided in relevant part: ". . . at any time after such hearing [upon a petition alleging that a minor is, by reason of violation of any criminal statute or ordinance, a person described in Section 602], a minor who was 16 years of age or older at the time of the commission of an offense and who was committed therefor by the court to the Youth Authority, is returned to the court by the Youth Authority pursuant to Section 780 or 1737.1, the court may make a finding noted in the minutes of the court that the minor is

"Commitment to the Youth Authority is the placement of last resort for juvenile offenders. (*In re Aline D.* (1975) 14 Cal.3d 557, 564. . . .)" (*In re Bryan* (1976) 16 Cal.3d 782, 788 [129 Cal.Rptr. 293, 548 P.2d 693].) Yet on the other hand section 1737.1 announces a legislative policy that the juvenile court may not recommit to the Youth Authority a person returned to the court pursuant to the provisions of that section. The juvenile court, having tried without success other lesser dispositions available to it, properly asks, what disposition can it make?

There is also involved the dilemma posed by the disagreement between the psychiatrists of the Youth Authority who insist that the ward needs psychiatric treatment, and the psychiatrists who have examined the ward and have concluded that his mental condition is not such as to warrant involuntary commitment.

It is concluded that the juvenile court did not err in continuing the ward under the existing commitment of July 29, 1975, and that although

not a fit and proper subject to be dealt with under this chapter, and the court shall direct the district attorney or other appropriate prosecuting officer to prosecute the person under the applicable criminal statute or ordinance and thereafter dismiss the petition or, if a prosecution has been commenced in another court but has been suspended while juvenile court proceedings are held, shall dismiss the petition and issue its order directing that the other court proceedings resume."

In *Bryan* v. *Superior Court* (1972) 7 Cal.3d 575 [102 Cal.Rptr. 831, 498 P.2d 1079] [cert. den. 410 U.S. 944 (35 L.Ed.2d 610, 93 S.Ct. 1380)], the court had adopted a theory of continuing jeopardy. It noted, "The dispositional order of commitment to the Youth Authority was 'final,' however, only in the limited sense that it was appealable. (§ 800.) The court's determination that petitioner should be committed to the authority was necessarily tentative in nature under our statutory scheme since the authority is expressly empowered to refuse such a commitment. [Citations.] Thus the jeopardy to which a minor is subjected in juvenile court proceedings which follow the course of those here under consideration is not terminated by the court's tentative decision to commit the minor to the Youth Authority. No new jeopardy attaches when the juvenile court, after the authority refuses to accept a minor, transfers him to the criminal court. This application of section 707 comports both with constitutional concepts and with the legislative intent that the Youth Authority, in light of its familiarity with its own facilities and programs, shall have power to balance the interests of the particular minor, of society, and of the overall operation of the authority, and determine that the minor should or should not be accepted by the authority." (7 Cal.3d at pp. 583-584.) Although it withheld approval of the procedure which would permit further prosecution in the criminal court when a ward was returned after acceptance and partial treatment (*id.,* p. 584, fn. 9), it concluded that where there was an original rejection, the mere making of the order did not preclude further prosecution because of double jeopardy. Following *Breed* v. *Jones,* the court reversed itself and vacated the convictions which had been obtained against *Bryan* in the criminal proceedings. (*In re Bryan* (1976) 16 Cal.3d 782, 787 [129 Cal.Rptr. 293, 548 P.2d 693].) The Legislature likewise followed the United States Supreme Court's application of the double jeopardy rule and eliminated the language quoted above when it recast section 707. (Stats. 1975, ch. 1266, §§ 3 and 4, effective Jan. 1, 1976.)

it may have been a technical error to release the ward from the custody, the director cannot complain because it was occasioned by his failure to exercise his continuing jurisdiction.

## I

The director contends that the superior court was without jurisdiction to recommit the ward to the Youth Authority. He points out that the Legislature has vested in the Youth Authority the discretion to determine whether any person committed to it falls within any of the criteria authorizing the authority to return him to court. (See § 1737.1, *supra,* fn. 3; *People* v. *Ferrel* (1972) 25 Cal.App.3d 970, 977 [102 Cal.Rptr. 372]; and *People* v. *Woolbert* (1965) 232 Cal.App.2d 544, 546 [42 Cal.Rptr. 919]. Note also, with respect to original acceptance or rejection by the authority, *Bryan* v. *Superior Court* (1972) 7 Cal.3d 575, 584-586 [102 Cal.Rptr. 831, 498 P.2d 1079] [cf. *In re Bryan* (1976) 16 Cal.3d 782 [129 Cal.Rptr. 293, 548 P.2d 693], applying *Breed* v. *Jones, supra,* 421 U.S. 519]; *People* v. *Ralph* (1944) 24 Cal.2d 575, 583 [150 P.2d 401]; *In re Herrera* (1943) 23 Cal.2d 206, 212 [143 P.2d 345] [disapproved on another issue *People* v. *Olivas* (1976) 17 Cal.3d 236, 257 [131 Cal.Rptr. 55, 551 P.2d 375]]; and *People* v. *Bell* (1971) 17 Cal.App.3d 949, 957 [95 Cal.Rptr. 270].) He then insists on strict application of the last clause of section 1737.1 reading "said [juvenile] court may not recommit such person to the Youth Authority." He acknowledges that section 780, after recognizing the Youth Authority's discretion to return a ward to the committing court, continues, "However, the return of any person to the committing court does not relieve the Youth Authority of any of its duties or responsibilities under the original commitment, and such commitment continues in full force and effect until it is vacated, modified, or set aside by order of the court."[8] He dismisses section 780 as having been enacted in 1961 to prevent "a hiatus in jurisdiction between the time the Youth Authority returns a ward under section 1737.1 . . . and the time when the juvenile court resumes its jurisdiction and enters a new disposition." He insists that the court was required to make a further order which would not result in returning the ward to the custody of the Youth Authority.

[8]The first sentence of section 780 reads, "If any person who has been committed to the Youth Authority appears to be an improper person to be received by or retained in any institution or facility under the jurisdiction of the Youth Authority or to be so incorrigible or so incapable of reformation under the discipline of any institution or facility under the jurisdiction of the Youth Authority as to render his retention

On behalf of the juvenile court it is not urged, as we review below, that the inconsistency between the provisions of section 780 and of section 1737.1 must be resolved to favor the application of the former. It is contended that 1737.1, when properly construed in the light of the total statutory scheme and purpose of the Youth Authority Act, does not give. the authority the power to reject a person following an adjudicatory hearing in the juvenile court. The court also asserts that the application of the express provisions of section 1737.1 to a commitment of last resort, is an unlawful delegation of power to an administrative agency. As a third attack on the director's position, it is asserted that to preclude the court from preserving the existing commitment or from recommitting the ward to the Youth Authority divests the people of their inalienable right to governmental protection from crime and violence.

We do not find those contentions decisive. Nevertheless we conclude that the provisions of section 780 must govern those found in section 1737.1, and the court acted properly in refusing to vacate, modify or set aside its commitment of July 29, 1975.

A

On analysis it appears that the first contention rests, not upon the provisions of the law as they existed before January 1, 1976, but on the

detrimental to the interests of the Youth Authority, the Youth Authority may return such person to the committing court."

The second paragraph of section 780 provides: "When any such person is so returned to the committing court, his transportation shall be made, and the compensation therefor paid, as provided for the execution of an order of commitment."

The Juvenile Court Law of 1915 (Stats. 1915, ch. 631, p. 1225 et seq.) in section 10 contained provisions similar to the foregoing as now found in section 780. (*Id.,* § 10, p. 1233.) These provisions were followed, in the same section, with provisions which directed that in the event the returned ward originally had been accused of a felony, the committing judge should sit as a magistrate and hold a preliminary hearing. If probable cause was found proceedings would follow as usual in cases of a felony. (*Id.,* pp. 1233-1234.) The foregoing provisions were incorporated in sections 747, 748 and 749 of the Welfare and Institutions Code in 1937. (Stats. 1937, ch. 369, §§ 747-749, pp. 1040-1041.) They were amended without significant change in 1943 (Stats. 1943, ch. 481, §§ 11 and 12, p. 2017), and in 1945 (Stats. 1945, ch. 779, §§ 9 and 10, p. 1469). In 1947 section 747 was amended by the addition of the language quoted in the text from the second sentence of section 780. (Stats. 1947, ch. 1087, § 1, pp. 2500-2501.) In 1961, as part of the current Juvenile Court Law, section 780 was adopted in its present form. (Stats. 1961, ch. 1616, § 2, p. 3492.) The provisions formerly found in section 749 were not continued. The only provisions for prosecution of the accused juvenile as a criminal were those incorporated in section 707. (*Id.,* p. 3485.) It was not until 1965 that section 707 was amended to provide that a returnee from the Youth Authority could be referred for prosecution as a criminal. (Stats. 1965, ch. 534, § 1, p. 1850.)

necessity of reconstruing the law in the light of *Breed* v. *Jones, supra* (see fn. 7 above, and accompanying text). On behalf of the respondent court it is urged that the power to return a ward to the juvenile court has always been "inexorably bound to and unseverable from" that court's power to remand an offender for prosecution as a criminal with ultimate sentencing to a state prison. Therefore, it is contended, since the road to prison is closed, the protection of society requires that the Youth Authority retain one who appears "to be an improper person to be retained in" its institutions, or who appears "to be so incorrigible or so incapable of reformation under the discipline of the authority as to render his detention detrimental to the interests of the authority or the other persons committed thereto." Logic supports that position. It is not sensible to assert that "the Youth Authority" is the placement of last resort for juvenile offenders (see *In re Bryan, supra,* 16 Cal.3d 782, 788) when presumably all other dispositions available to the juvenile court have failed, and yet at the same time urge that when an offender so committed falls within one of the categories set forth in section 1737.1, the juvenile court must find a solution within those alternatives which have failed.

It is obvious that a new solution must be found, but it is the Legislature and not the courts which must fashion the necessary custodial institution and determine whether state or local authorities shall be responsible for it. We cannot arbitrarily conclude that because of the impingement of *Breed* v. *Jones, supra,* the Youth Authority must accept wards which it was not designed or intended to train and treat, nor can we arbitrarily say that the local authorities must provide new facilities.

*In re Aline D.* (1975) 14 Cal.3d 557 [121 Cal.Rptr. 816, 536 P.2d 65], involved the propriety of the juvenile court's action, not that of the Youth Authority, but the court did note, that the language of section 734 which requires that it must be "probable that [the ward] will be benefited by the reformatory educational discipline or other treatment provided by the Youth Authority" makes it clear that a CYA commitment may not be made for the sole reason that suitable alternatives do not exist. (14 Cal.3d at p. 562.)

The Legislature, by the amendment of section 707 to delete all references to the provisions of sections 780 and 1737.1, has indicated that the determination to prosecute a minor as a criminal must be made at

the inception of the proceeding. (Stats. 1975, ch. 1266, § 4, p. 3325, effective Jan. 1, 1976.) If such a determination is made, and the minor is found guilty, there are restrictions and qualifications upon the right to sentence him to prison (§ 707.2, as added Stats. 1975, ch. 1266, § 6, p. 3326). These provisions do not, however, affect past and then present wards of the authority such as we are concerned with here.

## B

■ The exercise of judicial power may not be conditioned on the approval of the executive or legislative branches of the government. (See *Esteybar* v. *Municipal Court* (1971) 5 Cal.3d 119, 127 [95 Cal.Rptr. 524, 485 P.2d 1140]; and *People* v. *Tenorio* (1970) 3 Cal.3d 89, 95 [89 Cal.Rptr. 249, 473 P.2d 993].) In *Tenorio* the court stated: "When the decision to prosecute has been made, the process which leads to acquittal or sentencing is fundamentally judicial in nature." (3 Cal.3d at p. 94.) The rule was applied to strike down a provision which required the prosecutor's consent before a court in sentencing could strike an admitted prior conviction (*id.*, p. 95). In *Esteybar* the court concluded, "Since the exercise of a judicial power may not be conditioned upon the approval of either the executive or legislative branches of government, requiring the district attorney's consent in determining the charge on which a defendant shall be held to answer violates the doctrine of separation of powers. While it may be conceded that the Legislature in the first instance was not required to give the power to a magistrate to determine whether to hold a defendant to answer to a felony or a misdemeanor charge, having done so, the Legislature cannot condition its grant upon the approval of the district attorney." (5 Cal.3d at p. 127.) So here it is urged that having given the juvenile court judge power to commit to the Youth Authority, the Legislature cannot condition that power upon the authority's consent or subsequent power to return the ward to the court. The cases which have been referred to in this part I, preclude the acceptance of that argument.

*In re Herrera, supra,* states, "There is no unconstitutional delegation of legislative or judicial power, as petitioners contend, in thus vesting power in the Authority to determine, within the limits prescribed, how long convicted persons shall be detained and how they shall be treated after commitment. The standards governing the Authority in determining the kind of treatment and release of such persons are well within constitutional requirements. [Citations.]" (23 Cal.2d at p. 211.) As pointed out in

*People* v. *Ferrel, supra,* section 1737.1 "is designed to facilitate the handling by the Youth Authority of juvenile offenders who, in the opinion of the authority, are amenable to treatment through its available resources." (25 Cal.App.3d at p. 977.) The juvenile court's judicial power is exercised in determining whether the ward should be committed to the Youth Authority if qualified and acceptable. (See §§ 734-736 and 1736; and *In re Clarence B.* (1974) 37 Cal.App.3d 676, 682-683 [112 Cal.Rptr. 474]. Cf. *In re Aline D., supra,* 14 Cal.3d 557, 567.) The Legislature has properly delegated to the Youth Authority the discretion to determine whether its facilities will be or are of benefit to the ward. (See §§ 736 and 780; and note *People* v. *Tenorio, supra,* 3 Cal.3d at pp. 94-95, recognizing the discretion conferred on the Adult Authority.)

## C

In *Craig* v. *Superior Court* (1976) 54 Cal.App.3d 416 [126 Cal.Rptr. 565], Justice Elkington of this court gave voice to "the *right of the people* to governmental protection from crime and violence." (54 Cal.App.3d at p. 427, and see generally pp. 426-428.) On behalf of the court it is asserted that the last clause of section 1737.1 should be disregarded because the purported action of the Youth Authority under those provisions have deprived the juvenile court of its capability of protecting the personal security of the citizens of this community. As we have seen above, it is the Legislature by its failure to provide for the situation created by *Breed* v. *Jones* which has failed to act. It is not the function of this court to determine whether the state institution, the Youth Authority, or the county should provide additional facilities, be it for incarceration or treatment.

## D

In our opinion the order of the court refusing to vacate, modify or set aside the commitment made July 29, 1975, may be sustained on two grounds.

In the first place although the director's letter of October 20, 1975, recites "all Youth Authority resources have been exhausted in the treatment of John's problems" and "I am . . . ordering return of the minor to court pursuant to Section 1737.1," an examination of the record as a whole reflects that the ward was being returned so that he could be evaluated for a possible conservatorship and be committed to the

facilities of the State Department of Mental Hygiene under the provisions of section 5150 of the Welfare and Institutions Code. Section 779 expressly provides in pertinent part, ". . . before any inmate of a correctional school may be transferred to a state hospital, he shall first be returned to a court of competent jurisdiction and, after hearing, may be committed to a state hospital for the insane in accordance with law." (See *In re Michael E., supra,* 15 Cal.3d 183, 192-193; and *In re L.L., supra,* 39 Cal.App.3d 205, 209-210 and 214-215.) The director by designating the return as under the provisions of 1737.1 cannot create a situation which is other than as revealed by the true facts. Therefore, when it was determined that the ward was not a fit subject for a conservatorship and a commitment, he was properly ordered returned to the Youth Authority under the existing commitment. It was the Youth Authority (§ 1755.3), not the juvenile court (§ 739), which was charged with furnishing the ward medical care short of commitment.[9]

In the second place, we are of the opinion that the provisions found in section 780 which place no constraint on the order that the juvenile court may make, govern the provisions of section 1737.1 insofar as they conflict. In the first place, section 1737.1 is found in the Youth Authority Act among provisions which generally deal with the commitment of youths who have been convicted of a public offense in the criminal courts. *In re Dargo* (1948) 86 Cal.App.2d 114 [194 P.2d 34], dealt with the case of a Youth Authority parolee who was found to have committed an assault. He contended that the last paragraph of section 1737.1 precluded his recommitment to the authority. The court pointed out that the minor had not been returned to the court as an incorrigible or other person described in section 1737.1, but it also went on to note that the minor was not a "person who has been charged with or convicted of a public offense." The court stated, "A proceeding under section 720 of the Juvenile Court Law to have a minor declared a ward of the juvenile court is not a 'criminal' proceeding. It is not a proceeding in which a minor is 'charged with' or 'convicted of' a public offense. It is a proceeding 'more in the character of a guardianship whereby the minor is relieved of the stigma of a criminal conviction by placing him upon probation with individuals or in institutions having the facilities to give

---

[9]We note that in 1975 (Stats. 1975, ch. 1258, § 5, p. 3300) the Legislature added the following provisions to the Youth Authority Act, "§ 1756.1. The Director of the Youth Authority shall conduct a study on the feasibility of establishing on a regional basis mental health treatment facilities for mentally disordered persons confined in state correctional schools and on parole therefrom and shall report his findings to the Legislature by March 1, 1976."

him corrective care, supervision and training.' (*In re Dargo* [1947], 81 Cal.App.2d 205, 207. . . .)" (86 Cal.App.2d at p. 117.) So here the defendant was not a person referred to in section 1737.1. We note that in 1965, when section 707 was amended to refer to the ward's return to the juvenile court, it referred to sections 780 and 1737.1 indiscriminately. (Stats. 1965, ch. 534, § 1, p. 1850.) In *Bryan* v. *Superior Court, supra,* the sections as referred to in section 707 were also referred to indiscriminately (see 7 Cal.3d at p. 580, fns. 3 and 4, and accompanying text). There is nothing in the legislative act or the decision to indicate that section 1737.1 should not be given the interpretation made in *Dargo.*[10]

Finally, we note that the provisions in section 1737.1 on which the director relies were first adopted in 1945. (Stats. 1945, ch. 781, § 1, p. 1470.) The provisions found in section 780 which continue the responsibility of the Youth Authority until a further order is made by the juvenile court were adopted two years later (see fn. 8 above). The provisions of section 1737.1 were reenacted in 1969 when "detention" was substituted for "retention" in the first sentence. (Stats. 1969, ch. 924, § 1, p. 1853.) We attach no particular significance to that republication in view of the nature of the amendment and the fact that *In re Dargo, supra,* had previously indicated that the section did not govern a ward of the juvenile court who had been committed to the Youth Authority.

For the reasons set forth in this part, we conclude that the juvenile court did not err in ordering the minor continued under the July 29, 1975 commitment to the Youth Authority. There remains for consideration the propriety of that part of the order releasing him from custody.

II

The director complains that the trial court was without jurisdiction to release the ward on parole from the Youth Authority. That objection is technically correct. "Except as provided in Section 1711.5 of this code, every order granting probation to, committing to an institution, granting and revoking parole and issuing final discharges to any person under the control of the authority shall be made by the authority and the authority may not delegate the making of such decisions to any other body or person. All other powers conferred on the authority may be exercised through subordinates under rules established by the authority.

[10]In 1976 the Legislature clarified the provisions of section 1737.1 so that after the effective date of the amendments it will only apply to those committed by the adult court. (Stats. 1976, ch. 1071, § 33.)

Any person subjected to an order of such subordinates may petition the authority for review. The authority may review such orders under appropriate rules and regulations." (§ 1767, see also §§ 1711.3, 1711.5 and 1766.) The juvenile court that has committed a ward to the juvenile court "may thereafter change, modify or set aside the order of commitment." (§ 779.) The cited section, however, further provides, "Except as in this section provided, nothing in this chapter shall be deemed to interfere with the system of parole and discharge now or hereafter established by law, or by rule of the Youth Authority, for the parole and discharge of wards of the juvenile court committed to the Youth Authority, or with the management of any school, institution, or facility under the jurisdiction of the Youth Authority." (*Id.*)

In October when commitment with the Department of Mental Hygiene first proved abortive, the court dropped the petition for a new disposition from the calendar, and ordered the ward returned to the Youth Authority. His custody was then governed by the provisions of section 737, which read: "(a) Whenever a person has been adjudged a ward or dependent child of the juvenile court and has been committed or otherwise disposed of as provided in this chapter for the care of wards or dependent children of the juvenile court, the court may order that said ward or dependent child be detained in the detention home, or in the case of a ward of the age of 18 years or more, in the county jail or otherwise as to the court seems fit until the execution of the order of commitment or of other disposition.

"(b) In any case in which a minor is detained for more than 15 days pending the execution of the order of commitment or of any other disposition, the court shall periodically review the case to determine whether the delay is reasonable. Such periodic reviews shall be held at least every 15 days, commencing from the time the minor was initially detained pending the execution of the order of commitment or of any other disposition, and during the course of each review the court shall inquire regarding the action taken by the probation department to carry out its order, the reasons for the delay, and the effect of the delay upon the minor."

As the ward was then over 18 years of age he was placed in the custody of the sheriff. The matter was periodically reviewed. On December 16, 1976, the probation officer made a recommendation that the matter be continued two weeks for clarification of the dispute between the Youth

Authority which was insisting on the application of the last sentence of section 1737.1, and the juvenile court which was insisting that jurisdiction remain with the authority under the provisions of section 780. It would appear therefore that when the Youth Authority persisted in its refusal to accept the return of the ward, the court was not placing the ward on parole but making an order terminating his interim custody because of the Youth Authority's failure to accept that custody. The fact that this restored the ward to a status of freedom commensurate with that of a parolee of the Youth Authority was occasioned by the authority's failure to assume custody. It cannot be attributed to the court's intermeddling with a discretion vested in the Youth Authority when the authority was at the time denying its jurisdiction to exercise such discretion. The juvenile court concedes that at such time as the Youth Authority recognizes its responsibility for the custody of the ward, that portion of the order releasing the ward from custody should be set aside. We construe the order, as automatically so self-terminating, and not requiring any relief in these proceedings.

The petition for writ of prohibition and mandate is denied, and the alternative writ of mandate is discharged.

Molinari, P. J., and Elkington, J., concurred.